Dennis Stewart (SBN 99152)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

***Counsel for Plaintiff and the Proposed Class***
*Additional Plaintiff's Counsel Appear*
*on the Signature Page*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| Alison Kavulak, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Alison Kavulak, on behalf of herself and all others similarly situated, brings this class action complaint for damages, restitution, and injunctive relief against Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp. (collectively, "Google"). Plaintiff is informed and believes, and thereon alleges the following:

## NATURE OF ACTION

1.      Google has acquired and maintained unlawful monopolies in the Android App Distribution Market and the Android In-App Payment Processing Market through various

anticompetitive means, including but not limited to: (1) conditioning licensing of the Android operating system, Google Play Store, and other essential Google services on original equipment manufacturers' ("OEMs") agreement to give the Google Play Store preferential treatment; (2) imposing technical restrictions and obstacles on both OEMs and developers that prevent the distribution of Android apps outside of the Google Play Store; (3) conditioning app developers' ability to effectively market their apps to Android users on being listed in the Google Play Store; (4) contractual restrictions on app developers that force use of Google's in-app payment processor; and (5) stifling consumers' ability to download alternative app stores and apps directly from developers' website.

2.     But for Google's monopolistic conduct, competitors could offer consumers and developers choice in app distribution and payment processing. With other viable options, app developers would not have to pay Google's supra-competitive tax of 30%. Rather, the price of distribution and payment processing alike would be set by market forces. Further, users and developers—not Google—would decide how (or even whether) user data was used for other purposes.

3.     There is no legitimate procompetitive justification for Google's conduct. As a direct result of its anticompetitive scheme, Google has not only impaired competition in the relevant markets but also caused consumers such as Plaintiff injury in the form of supra-competitive prices paid for apps and in-app purchases from the Google Play Store.

## PARTIES

**Plaintiff**

4.     Plaintiff Alison Kavulak is a citizen of the State of Iowa. She purchased application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant period.

**Defendants**

5.     All of the following Defendants contract with app developers that distribute their apps through the Google Play Store:

a.   Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.

b.   Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC.

c.   Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC.

d.   Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC.

6.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

**JURISDICTION & VENUE**

7.      This Court has subject matter jurisdiction over the federal antitrust claims pursuant to Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements. Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the Defendants reside in this district or is licensed to do business in this district. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this district.

**FACTUAL ALLEGATIONS**

**I.     THE RELEVANT MARKETS**

10.     Google's anticompetitive conduct affects multiple product markets: (1) the market for mobile devices and their accompanying operating system ("OS") platforms; (2) the market for licensable mobile operating system platforms; (3) the Android app distribution market; and (4) the Android in-app payment processing market.

### A. Mobile Devices and Their OS Platforms

11.     There is a relevant market for smart mobile devices such as smartphones and tablets that consumers use to connect to the internet and perform various functions including internet browsing, social media, video and music streaming, and playing games.

12.     There is an accompanying market for operating systems for those mobile devices. Mobile devices require an operating system ("OS") that enables multi-purpose computing functionality, including, but not limited to: (1) button, touch, and motion commands; (2) a "graphical user interface" made up of icons indicating actions a user may take; (3) basic operations such as cellular or WiFi connectivity, GPS positioning, camera and video recording, and speech recognition; and (4) the installation and operation of compatible mobile apps. Mobile device operating systems are another distinct relevant market because operating systems for non-mobile devices are not viable technical substitutes.

13.     In addition to providing basic functions for mobile device users, operating systems provide a platform for applications developers. Operating systems contain code, including application programming interfaces ("APIs"), enabling developers to write their applications so that those applications can run on the OS and are compatible with any other applications or platforms that the developer of the OS distributes or bundles with the OS.

14.     There are no reasonable substitutes for mobile operating systems, and, therefore, from application developers' perspective, there are no reasonable substitutes for reaching consumers who utilize mobile devices. Likewise, mobile devices cannot be used by purchasers without operating systems that control the use of the device and that serve as a platform for other platforms and applications.

15.     An OEM must pre-install an OS on each mobile device prior to its sale so that purchasers immediately have access to basic functions like the ones described above.

16.     Google dominates the mobile operating system market, accounting for over 95 percent of licensable mobile operating systems for smartphones and tablets in the United States and for over 70 percent of all mobile device usage worldwide.

**B.  Licensable Mobile OS Platforms**

17.     The majority of OEMs do not develop their own OS, so they must choose and license an OS for their mobile devices. Thus, there is a relevant market for Licensable Mobile OS Platforms for OEMs to install on their devices.[1]

18.     OEMs license mobile OSs for installation on mobile devices globally, excluding China. The geographic scope of the relevant Licensable Market for Mobile Operating System Platforms is therefore worldwide, excluding China. Notably, OEMs outside of China must all contractually consent that if their device licenses the Android OS that they will not sell devices preloaded with a competing, Android-compatible mobile OS.

19.     The geographic scope of the Licensable Market for Mobile OSs includes a separate market within the United States. The U.S. Licensable Market for Mobile OSs operates as described throughout this Complaint.

**C.  The Android App Distribution Market**

20.     There is also a relevant market for the distribution of apps compatible with the Android OS to mobile device users (the "Android App Distribution Market"). This Market comprises all the channels by which mobile apps developed to be compatible with and to use the code and APIs of the Android OS may be distributed to the hundreds of millions of mobile Android OS users. The Market primarily includes Google's dominant Google Play Store, with

---

[1] This market does not include: (1) proprietary OSs that are not available for licensing, such as Apple's mobile OS, called iOS; (2) mobile devices that lack the multi-computing functions of smart mobile devices and tablets (i.e., "flip phones"); or (3) electronic devices whose OS are not compatible with mobile device OS (i.e., desktop computers or gaming systems like Xbox).

smaller stores, such as Samsung's Galaxy Store and Aptoide. The nominal direct downloading of apps without using an app store ("sideloading") is also part of this market.

21.     App stores allow consumers to use their mobile device to browse, search for, access reviews on, purchase, download, and install mobile apps. It is commercially unreasonable for an OEM to sell a smart mobile device without an app store since the ability to find, purchase and/or download apps is one of the primary benefits of such devices.

22.     App stores are OS-specific and therefore only distribute apps compatible with a specific mobile OS. An Android OS owner will use an Android-compatible app store that distributes only Android-compatible mobile apps. Non-Android mobile app distribution platforms are not part of the Android App Distribution Market.

23.     Because only the OS-compatible version of that software can run on a specific device, console, or computer, any app developer that wishes to distribute apps for Android mobile devices must develop an Android-specific version of the app that is distributed through the Android App Distribution Market.

24.     In the alternative, the Android App Distribution Market is a relevant, economically distinct sub-market of a broader antitrust market for the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS. Because the Android OS dominates the larger market of all mobile operating systems, the Google Play store, compatible only with the Android OS, likewise dominates this broader app distribution market.

25.     The geographic scope of the Android App Distribution Market is worldwide, excluding China.  Outside of China, app distribution channels like app stores, are globally developed and distributed, and OEMs, in turn, make app stores like the Google Play Store globally available on Android devices.

26.     The geographic scope of the Android App Distribution Market includes a separate market within the United States. The U.S. Android App Distribution Market operates as described throughout this Complaint.

## II.     GOOGLE HAS MONOPOLY POWER IN THE LICENSABLE MOBILE OS PLATFORMS MARKET

27.     Google enjoys monopoly power in the Licensable Market for Mobile OS through its Android OS. The European Commission determined that the Android OS, licensed to OEMs in relevant respects by Google, is installed on over 95% of all mobile devices sold by OEMs utilizing a licensable mobile OS. Indeed, Android OS is installed on nearly 75% of all smart mobile devices sold by OEMs.

28.     OEMs design mobile devices to ensure compatibility with whatever OS was selected for that device. For OEMs, the process of implementing a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming. OEMs that have developed their devices around the Android OS face substantial costs in switching to another operating system, further giving Google monopoly power in the market for licensable mobile operating systems.

29.     A mobile ecosystem of products like apps, devices, and accessories typically develops around one or more mobile OSs, such as the Android OS. The "Android ecosystem" is, therefore, a system of mobile products that are inter-dependent and compatible with each other and the Android OS. Ecosystem participants include Google, OEMs of Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.

30.     Mobile ecosystems benefit from substantial network effects—as more developers design useful, compatible apps for a specific mobile OS, the more consumers will be drawn to use that OS, and the more consumers using an OS, the more developers want to develop apps for

it. As a result, new entrants to the OS market face significant barriers to entry. A new OS is only as desirable as the number of software applications running on it, and software developers are not incentivized to create apps for an OS that lacks a large existing base of users.

31.     To attract app developers and users, Google represents that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions.

32.     In fact, Google uses its Android OS to keep its ecosystem closed to any competition. As the dominant OS licensor, Google recognizes that participation on its platform is a "must-have" market for developers. Google only unlocks the door to its ecosystem for participants willing to play by Google's rules.

33.     Moreover, and as evidence of its market power over OEMs, Google uses the Android OS to restrict which apps and app stores OEMs pre-install on their devices and to deter the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

34.     OEMs have no other commercially viable choice but to license Google's Android OS, and, for developers, to develop applications to the OS that OEMs license. OEMs such as ZTE and Nokia acknowledge that other, non-proprietary OS are poor substitutes for and not a reasonable alternative to the Android OS, not least because other mobile OS do not presently support many high-quality and successful mobile apps deemed essential and/or valuable by consumers. Google, therefore, has constructed a market that biases consumers against devices with non-proprietary mobile OS other than Android OS, while putting OEMs at Google's mercy because their devices must offer a popular mobile OS and corresponding ecosystem to consumers.

## III.     GOOGLE HAS AND UNLAWFULLY MAINTAINS MONOPOLY POWER IN THE ANDROID APP DISTRIBUTION MARKET

**A. Google's Monopoly Power in the Android App Distribution Market**

35.     Google also has monopoly power in the Android App Distribution Market.

36.     Google's monopoly power is demonstrated by its massive market share in terms of apps downloaded. The European Commission determined that, within the Market, more than 90% of app store downloads were processed through the Google Play Store.

37.     Other existing Android mobile app stores cannot thwart Google's monopoly power in the Android App Distribution Market because no other app store reaches nearly as many Android users as the Google Play Store. The European Commission found the Google Play Store is pre-installed by OEMs on practically all Android mobile devices sold outside of China. No other Android app store comes close to that number of pre-installed users. With the exception of app stores designed for and installed only on mobile devices sold by particular OEMs (for example, Samsung Galaxy Apps and the LG Electronics App Store), no other Android app store is pre-installed on more than 10% of Android devices, and many have no appreciable market penetration at all.

38.     Because of Google's monopoly over Android app distribution, there is no viable substitute to distribution through the Google Play Store. As a result, the Google Play Store offers over 3 million apps, including all of the most popular Android apps, compared to just 700,000 apps offered by Aptoide, the Android app store with the next largest listing. The Google Play Store benefits from the large number of participating app developers and users. The ever-growing variety of apps attracts more and more users, and, in turn, the audience attracts app developers who wish to access Android users. The system feeds itself. Consequently, Android OEMs find it commercially unreasonable to make and sell phones without the Google Play Store, and they view other app stores as poor substitutes because they offer fewer and less impressive apps.

39.     As further proof of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps purchased through the Google Play Store, which is a far higher commission than would exist under competitive conditions.

40.     Google's monopoly power in app distribution is not constrained by competition at the smart mobile device level, whether the relevant market is defined as the Android App Distribution Market or, in the alternative, as the App Distribution Market in general.

41.     First, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching. Consumers choose a smartphone based in part on the pre-installed OS and its ecosystem. Once a consumer selects a smartphone, the consumer cannot replace the pre-installed mobile OS with an alternative. If they want to switch OS, that consumer must purchase a new mobile device. In addition, mobile OS have different designs, controls, and functions that consumers learn to navigate over time. The cost of learning to use a different mobile OS is part of consumers' switching costs.

42.     Second, switching from Android devices may result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data, even if such apps and products are available within the new ecosystem. A consumer switching OS would, consequently, lose their investment in the Android-specifics apps previously purchased and/or used.

43.     Third, consumers have no reason to inquire, and therefore do not know about, Google's anticompetitive contractual restraints and policies. Mobile device purchasers are focused on design, brand, processing power, battery life, functionality, and cellular plan. These

features are likely to play a substantially larger role in a consumer's decision as to which smart mobile device to purchase than Google's anticompetitive conduct in the relevant markets.

44.     Consumers are also unable to determine the "lifecycle price" of devices—i.e., to accurately assess at the point of purchase how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers cannot predict all of the apps or in-app content they may eventually purchase. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

45.     Given consumers' essentially unavoidable "lock-in" to the Android OS, developers must participate in the Android ecosystem. The alternative is losing access to millions of Android users.

**B. Google's Unlawful Maintenance of its Monopoly of the Android App Distribution Market**

46.     Mobile apps make mobile devices more useful and valuable because they add user-specific functionality like working, video chatting, banking, shopping, job hunting, photo editing, reading digital news sources, editing documents, or playing a game like Hearthstone or Pokémon Go. Many consumers do not even own a traditional computer. But even when a consumer can perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable and important.

47.     Some apps are pre-installed by OEMs. However, OEMs cannot anticipate the various apps a specific consumer may want, nor should they try since that may result in a device overloaded with preinstalled apps of no interest to a given consumer. Moreover, apps developed after a user buys his or her mobile device cannot, as a practical matter, be pre-installed.

48.     Consequently, mobile devices must provide a way for users to download and/or buy apps post-purchase. On Android devices, this is primarily done through the Google Play Store, a digital portal set up by Google. Through this Store, mobile apps can be browsed, purchased (if necessary), and downloaded by a consumer. App stores such as the Google Play Store, alongside other distribution platforms available to the hundreds of millions of consumers using Android-based mobile devices, comprise the Android App Distribution Market.

**C. Google's Anticompetitive Conduct Through the OEM Channel in the Android App Distribution Market**

49.     Through various anticompetitive acts and unlawful restraints on competition, Google maintains a monopoly in the Android Mobile App Distribution market, causing ongoing harm to competition and injury to OEMs, app distributors, app developers, and consumers. Google's restraints of trade undermine representations that "as an open platform, Android is about choice," and that app developers "can distribute [their] Android apps to users in any way [they] want, using any distribution approach or combination of approaches that meets [their] needs," including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers." None of this is true, and Google has used anticompetitive means to ensure that this is the case.

50.     Google has willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of related anticompetitive acts designed to foreclose alternative and competing Android app distribution channels.

51.     First, Google imposes anticompetitive restrictions on OEMs. It conditions OEM licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on an OEM's agreement to provide the Google Play Store with preferential treatment compared to any other competing app store.

52.     Specifically, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS in the licensable market) must sign a Mobile Application Distribution Agreement ("MADA") with Google. A MADA confers a license to a product bundle comprised of proprietary Google apps, Google-supplied services necessary for mobile app functionality, and the Android trademark. The MADA requires OEMs to locate the Google Play Store on the "home screen" of each mobile device. Android OEMs must further pre-install up to 30 Google mandatory apps and locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services.

53.     These requirements ensure that the Google Play Store is the most visible app store any user encounters. All other app stores are, therefore, purposely placed at a significant disadvantage.

54.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores. This would allow competing app stores to vie for prominent placement on Android devices, increase exposure to consumers and, as a result, increase their ability to attract app developers to their store. An app distributor could and would negotiate with OEMs to offer a prominently displayed app store containing its apps, allowing it to reach more mobile users.

55.     Second, Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store. Some OEMs might compete for buyers by offering mobile devices with easy access to additional mobile app stores and apps through, for instance, preinstalled and/or prominently placed icons. Even when an OEM wants to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing the app, even though the consumer is choosing to install

the app in full awareness of its source. This conduct dissuades users from downloading apps outside of the Google Play Store.

56.     Third, Google interferes with OEMs' ability to license, distribute, and prominently display competing Android app stores by forcing any OEM who wishes to license even one of the applications included in what Google arbitrarily designates part of Google Mobile Services ("GMS")—a suite of applications including Google Search, Google Chrome, YouTube, Google Maps, and the Google Play Store—to enter a MADA requiring it to license and prominently display every GMS application.

57.     There is a separate market for each GMS application that OEMs must distribute together pursuant to the MADA. For example, there is a distinct market for mobile map applications. There is a separate relevant market for Internet search applications. The applications in each category are not substitutable for applications in any of the other categories. Google has market power in at least one of these markets, in addition to the market for application distribution on licensable operating for mobile devices. For example, Google has at least at 65% of the market for mobile map applications. By forcing OEMs to license and prominently display all GMS apps merely to license only one of those apps, Google is using its market power over discrete applications to disadvantage competing app stores.

**D. Google's Anticompetitive Conduct Imposed on Developers in the Android App Distribution Market**

58.     Google also imposes anticompetitive restrictions on competing app distributors and developers to further entrench its monopoly in Android App Distribution.

59.     First, Google prevents developers from providing an app that, when downloaded from the Google Play Store, would operate as a competing mobile storefront for other app purchases. Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other pro-competitive justification.

60.     Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store. Each of the Defendants, except Google Payment, is a party to the DDA.

61.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement. The DDA is nonnegotiable, so developers seeking access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

62.     In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, easily downloaded and installed through the Google Play Store. App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as, for example, an app store that specializes in games. Without Google's unlawful restraints, these app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.

63.     Second, Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store. Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties." This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners," that are specially optimized for the advertising of mobile apps.

However, to access the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to, including through Google's monopoly search engine, but for Google's restrictions.

64. Google directly and anticompetitively restricts how consumers discover, download, and install mobile apps and app stores. Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"— Google uses the Android OS to impose a series of technological impediments designed to dissuade users from direct downloads.

65. But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer. There is no reason that downloading and installing an app on a mobile device should be different. Millions of personal computer users easily and safely download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader.

66. Direct downloading on Android mobile devices, however, differs dramatically. Google ensures that the Android process is technically complex, confusing, threatening, and filled with dire warnings that scare most consumers into abandoning the lengthy process.

67. Even after a user runs the gauntlet of warnings and threats, Google denies directly downloaded apps the permissions necessary to be seamlessly updated in the background—a benefit reserved solely for apps downloaded via the Google Play Store. Instead, users must manually trigger these updates, which may even require revisiting the original download process, complete with its hurdles and warnings. This imposes onerous obstacles on consumers who wish

17

to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

68.     Google further restricts direct downloading under the guise of offering protection from malware. When Google deems an app "harmful," Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the app from a consumer's device. Direct downloading is entirely prevented on Android devices that are part of Google's so-called Advanced Protection Program ("APP"). Consumers enrolled in APP cannot directly download apps; their Android device can only download apps distributed in the Google Play Store or in another pre-installed app store that Google preapproved an OEM to offer on its devices. App developers therefore cannot reach APP users unless they first agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store, where available. Google's invocation of security is an excuse to further strangle an app developer's ability to reach Android users, as shown by a comparison to personal computers, where users can securely purchase and download new software without being limited to a single software store owned or approved by the user's anti-virus software vendor. This comparison shows that Google's multiple technical barriers to direct downloading from alternative sources go far beyond what is necessary to achieve any legitimate security objections. Put differently, Google has not adopted the least restrictive means necessary for achieving any legitimate security objectives.

69.     Direct downloading is also nominally available to competing app distributors who seek to distribute competing Android app stores directly to consumers. However, the same restrictions Google imposes on the direct downloading of apps apply to the direct downloading of app stores. Indeed, Google Play Protect has flagged at least one competing Android app store, Aptoide, as "harmful," further hindering consumers' ability to access a competing app store.

70.     Additionally, apps downloaded from "sideloaded" app stores, like apps directly downloaded from a developer's website, may not be automatically uploaded in the background. Thus, direct downloading is not a viable way for app stores to reach Android users, any more than it is a viable alternative for single apps. The only difference is that the former do not have any alternative, ensuring the latter are forced into the Google Play Store. Google's barriers erected against competing app distributors also are not the least restrictive means necessary to achieve any legitimate security objectives.

71.     But for Google's restrictions on direct downloading, app distributors and developers could try to directly distribute their stores and apps to consumers.

72.     There is no legitimate reason for Google's conduct, and even if there were, Google has not adopted the least restrictive means for achieving it. For decades, PC users have installed software acquired from various sources without being deterred by anything like the obstacles erected by Google. A PC user can navigate to an internet webpage, click to download and install an application, and be up and running, often in a matter of minutes.

73.     Through these anticompetitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over Android mobile app distribution. Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

**E.   Anticompetitive Effects in the Android App Distribution Market**

74.     Google's anticompetitive conduct forecloses competition in the Android App Distribution Market, affects a substantial volume of commerce in this Market and causes anticompetitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

75.     As described above, Google's anticompetitive conduct harms OEMs by forcing them to dedicate valuable "home screen" real estate to the Google Play Store and other mandatory Google applications, regardless of the OEM's preferences, which might include allowing other app stores or developers to place an icon there. Individually and together, these requirements limit OEMs' ability to differentiate themselves and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of preinstalled apps that would appeal to particular subsets of mobile device consumers.

76.     Google's anticompetitive conduct harms would-be competitor app distributors, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

77.     Google's anticompetitive conduct harms app developers, who must agree to Google's anticompetitive terms and conditions to reach many Android users, through downloads or Google's advertising platforms. Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps. By restricting developers, Google ensures that the developer's apps will be distributed on the Google Play Store, which empowers Google to monitor the apps' usage. This information can, in turn, be used by Google to develop and offer its own competing apps that are, of course, not subject to Google's supracompetitive taxes.

78.     Both developers and consumers are harmed by Google's supra-competitive taxes of 30% on the purchase price of apps distributed through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market unimpaired by Google's

anticompetitive conduct. Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers of incentive and capital to develop new apps and content.

79.     Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps in different and innovative ways—for example, through genre-specific app stores. Google, by restraining the distribution market and eliminating the ability and incentive for competing app stores, also limits consumers' ability to discover new apps of interest to them. More competing app stores would permit additional platforms to feature diverse collections of apps. Instead, consumers are left to sift through millions of apps in one monopolized app store, where Google controls which apps are featured, identified, or prioritized in user searches.

## IV.     GOOGLE HAS AND UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID IN-APP PAYMENT PROCESSING MARKET

### A. Google's Monopoly Power in the Android In-App Payment Processing Market

80.     There is a relevant antitrust market for processing payment for digital content, including virtual gaming products, within Android apps (the "Android In-App Payment Processing Market"). The Android In-App Payment Processing Market is comprised of the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of in-app digital content.

81.     App developers selling in-app digital content must offer transactions that are seamless, engrossing, quick, and fun. It is critical that such purchases can be made during gameplay itself.

82.     Mobile game developers particularly value seamless in-app purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app. For these reasons, and in the alternative, there is a relevant antitrust sub-

market for the processing of payments for the purchase of virtual gaming products within mobile Android games (the "Android Games Payment Processing Market").

83.     The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools for all apps distributed through the Google Play Store, which as noted above dominates distribution of apps outside of China.

84.     The geographic scope of the Android In-App Payment Processing Market includes a separate market within the United States. The U.S. Android In-App Payment Processing Market operates as described throughout this Complaint.

85.     Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

**B.  Google's Unlawful Maintenance of its Monopoly of the Android In-App Processing Market**

86.     By selling digital content within a mobile app rather than charging for the app itself, app developers can make an app widely accessible to all users, then generate revenue to use in developing new apps. This is especially true for mobile game developers. Many games are free to download and play but make additional content available for in-app purchasing on an à la carte basis or via a subscription-based service. App developers who sell digital content rely on in-app payment processing tools to process consumers' purchases in a seamless and efficient manner.

87.     Google has pursued a strategy of anticompetitive conduct, however, to ensure that Android app developers are not free to utilize any one of the multitude of electronic payment processing solutions available to process in-app purchases and other transactions. Instead,

Google conditions developers' access to the dominant Google Play Store on an agreement to use Google Play Billing to process in-app purchases. Google thus ties its Google Play Store to its own proprietary payment processing tool and uses that tie to maintain its monopoly over the Android In-App Payment Processing Market, as defined below.

88.     Absent Google's unlawful conduct, app developers could integrate compatible payment processors into their apps to facilitate in-app digital content purchases or develop such functionality themselves. Developers could even offer users a choice among multiple payment processors for each purchase, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more. This would, in turn, result in lower prices for consumers.

**C.  Google's Anticompetitive Conduct in the Android In-App Payment Processing Market**

89.     For apps distributed through the Google Play Store, Google requires use of Google Play Billing to process in-app purchases of digital content and for all purchases within Android games. Because 90% or more of Android-compatible mobile app downloads through an app store are conducted in the Google Play Store, Google has a monopoly in these Markets.

90.     Google charges a 30% commission for Google Play Billing. This rate reflects Google's market power, which allows it to charge supra-competitive prices for payment processing within the market. The cost of alternative electronic payment processing tools, which are prohibited by Google for apps purchased through the Google Play Store, can be one tenth of the 30% cost of Google Play Billing.

91.     Through provisions of Google's DDA imposed on all developers seeking access to Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing tool, Google Play Billing. Section 3.2 of the DDA requires that Android app developers enter into a separate

agreement with Google's payment processor, Google Payment, to receive payment for and from apps and in-app digital content.

92. Further, § 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory and those Policies require in relevant part that (1) Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment and (2) Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself (e.g., songs that can be played on other music players).

93. Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their mobile apps, depriving app developers and consumers alike a choice of competing payment processors.

94. Google has no legitimate justifications for its tie. If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app. But Google does allow alternative payment processing tools in that context, with no diminution in security.

**D. Anticompetitive Effects in the Android In-App Payment Processing Market**

95. Google's conduct harms competition in the Android In-App Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.

96.     Google's conduct harms would-be competitor in-app payment processors who would otherwise be free to innovate and offer Android consumers alternative payment processing tools with better functionality, lower prices, and tighter security.

97.     Google also harms app developers and consumers by inserting itself as a mandatory middleman in every in-app transaction. This prevents app developers from providing users comprehensive customer service relating to in-app payments without Google's involvement. Google has little incentive to compete through improved customer service because it faces no competition. Google does, however, have an incentive to obtain information concerning developers' transactions with their customers, which Google could use to give its ads and search businesses an anticompetitive edge. This is true regardless of whether the developer and or the app's users would prefer not to share their information with Google. In these ways and others, Google directly harms app developers' relationships with the users of their apps.

98.     Finally, Google raises app developers' costs and consumer prices through its supracompetitive 30% tax on in-app purchases, a price it could not maintain in a competitive payment processing market. The resulting increase in prices for in-app content likely deters some consumers from making purchases and deprives app developers of resources they could use to develop new apps and content. The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this action on behalf of herself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b) on behalf the Nationwide Class of: All persons who paid for an app on Google Play, subscribed to an app obtained on Google Play, or paid for in-app digital content on an app obtained on Google Play within the relevant statute of limitations (the "Class Period").

100.    Plaintiff also brings this action on behalf of herself and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b) on behalf of: All persons residing in Iowa who paid for an app on Google Play, subscribed to an app obtained on Google Play, or paid for in-app digital content on an app obtained on Google Play within the Class Period (the "Iowa Subclass").

101.    Specifically excluded from the Classes are: (a) any of the Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents; (d) all governmental entities; and (e) the judges and chambers staff in this case, as well as any members of their immediate families.

102.    Plaintiff does not know the exact number of class members. Due to the nature of the trade and commerce involved, there are tens of millions of class members geographically dispersed, the exact number and their identities being known to Defendants, such that joinder of all class members in the prosecution of this action is impracticable.

103.    Plaintiff's claims are typical of the claims of fellow class members because Plaintiff and class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all class members.

104.    Numerous questions of law or fact common to the Classes—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

      a.    whether Google has monopoly power in the Android App Distribution Market;

      b.    whether Google has market power in the alternatively defined App Distribution Market;

c.   whether Google has monopoly power in the Android In-App Payment Processing Market;

d.   whether Google's contractual restrictions for Google Play further Google's attempt to monopolize the Android App Distribution Market;

e.   whether Google's restriction on side-loading apps is an attempt to, and does in fact further, Google's monopoly over the Android App Distribution Market;

f.   whether Google's tie of its Google Play and Google Billing products furthers Google's attempt to monopolize the Android In-App Payment Processing Market;

g.   whether Google's conduct with respect to the Android In-App Payment Processing Market has attempted to monopolize that market;

h.   whether Google's conduct results in supra-competitive prices for Android Apps and for in-game purchases of Android Apps;

i.   whether Google's conduct has harmed or at least not benefited consumers; and

j.   the appropriate Class-wide measures of damages.

105.   These and other questions of law and fact are common to the Classes and predominate over any questions affecting the class members individually.

106.   Plaintiff will fairly and adequately represent the interests of the Classes because she purchased application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant period and has no conflicts with any other class member. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

107.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2
**Unlawful Monopoly Maintenance in the Android App Distribution Market**
**(On Behalf of the Nationwide Class Against All Defendants Except Google Payment)**

108.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

109.    Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

110.    The Android App Distribution Market is a valid antitrust market.

111.    Google holds monopoly power in the Android App Distribution Market.

112.    Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anticompetitive acts described herein, including, but not limited to: (1) conditioning licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement give the Google Play Store preferential placement and treatment; (2) imposing technical restrictions and obstacles on both OEMs and developers that prevent the distribution of Android apps through means other than the Google Play Store; and (3) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

113.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

114.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

115.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiff was injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT II – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**Unreasonable Restraints of Trade Concerning the**
**Android App Distribution Market: OEMs**
**(On Behalf of the Nationwide Class Against All Defendants Except Google Payment)**

116.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

117.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

118.    Google entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. These include MADA with OEMs that

condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary (and often the only) viable app store on Android mobile devices.

119.  These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

120.  Google's conduct affects a substantial volume of interstate as well as foreign commerce.

121.  Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

122.  Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and will continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT III – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**Unreasonable Restraints of Trade Concerning the Android App Distribution Market: DDA**
**(On Behalf of the Nationwide Class Against All Defendants Except Google Payment)**

123.     Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

124.     Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

125.     Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of their apps being distributed through the Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Android App Distribution Market.

126.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [i.e., code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the app on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

127.     These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

128.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

129.   Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

130.   Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT IV – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Unlawful Monopolization and Monopoly Maintenance in the**
**Android In-App Payment Processing Marketing**
**(On Behalf of the Nationwide Class Against All Defendants)**

131.   Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

132.   Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

133.   The Android In-App Payment Processing Market is a valid antitrust market. In the alternative, the Android Games Payment Processing Market is a valid antitrust market.

134.    Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

135.    Google has unlawfully acquired monopoly power in these Markets, including through the anticompetitive acts described herein. However Google initially acquired its monopoly, it has unlawfully maintained its monopoly through the anticompetitive acts described herein.

136.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

137.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

138.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT V – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**Unreasonable Restraints of Trade Concerning the**
**Android In-App Payment Processing Market**
**(On Behalf of the Nationwide Class Against All Defendants)**

139.   Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

140.   Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

141.   Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Android In-App Payment Processing Market.

142.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, compliance with Google's Developer Program Policies, which § 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

143.   The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, the Android Games Payment Processing Market.

144. Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

145. Defendants' conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

146. Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT VI – VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**Tying Google Play Store to Google Play Billing**
**(On Behalf of the Nationwide Class Against All Defendants)**

147. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

148. Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

149. Google has unlawfully tied the Google Play Store to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

150.    Google wields significant economic power in the tying market, the Android App Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

151.    Google only makes the Google Play Store available to those app developers who agree to exclusively process all app-related payments (including in-app purchases) through Google Billing. This tie is especially powerful and effective because Google simultaneously forecloses a developer's ability to use alternative app distribution channels, as described above. Taken together, Google's conduct effectively forces developers to use Google Billing.

152.    The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of distribution. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

153.    Google's conduct forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

154.    Google has thus engaged in a per se illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

155.    In the alternative only, even if Google's conduct does not constitute a per se illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

156.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT VII – VIOLATION OF THE UNFAIR COMPETITION ACT,**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On Behalf of the Nationwide Class Against All Defendants)**

157.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

158.    Plaintiff brings this claim on her own behalf and on behalf of each member of the proposed nationwide California-law class described above.

159.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200 et seq. As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

160. Defendants have engaged in, and continue to engage in, acts of unfair competition as defined in California's UCL. More specifically, Defendants, based upon the conduct alleged herein, have violated the unlawful and unfair prongs of the UCL.

161. At all pertinent times, the conduct complained of took place in, and has emanated from, California.

162. Google users, including Plaintiff, are individuals who lack sophistication and power. Google users are also consumers.

163. Defendants' acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Defendants have violated the unlawful prong of the UCL.

164. Defendants' conduct has harmed its users, competition, and the public generally.

165. Defendants' acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein. Defendants' acts as alleged herein violate each of the "unfairness" tests identified under California law.

166. Plaintiff and the Class Members are entitled to recover restitution.

167. Plaintiff is still a current user of Google Play Store and is also entitled to injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to her and the Class Members' detriment, with such an injunction requiring Defendants to halt their continuing wrongful acts described herein.

**COUNT VIII – VIOLATION OF IOWA COMPETITION LAW,**
**Iowa Code § 553.1, et seq.**
**(On Behalf of the Iowa Subclass Against All Defendants)**

168. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

169. Google's acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, et seq., which prohibits, inter alia, combinations to restrain or monopolize trade or commerce, id. § 553.4, and the monopolization or attempted monopolization of a market

for the purpose of excluding competition or of controlling, fixing, or maintaining prices, id. § 553.5.

170.    Google's conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

171.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on her behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.   Defendants have contracted, combined and conspired in violation of federal and state antitrust and unfair competition laws as alleged above;

B.  Plaintiff and the Class are entitled to recover treble damages and/or restitution, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

C.  Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

D.  Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including the issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein;

E.  Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.  Plaintiff and the Class receive such other or further relief as may be just and proper.

1

**JURY DEMAND**

2        Plaintiff, on behalf of herself and all others similarly situated, hereby demands a trial by

3   jury as to all issues so triable.

4     Dated: December 30, 2020               Respectfully submitted,

5

6                                           */s/* Dennis Stewart
                                            Dennis Stewart (SBN 99152)
7                                           **GUSTAFSON GLUEK PLLC**
                                            600 B Street
8                                           17th Floor
                                            San Diego, CA 92101
9                                           Telephone: (619) 595-3299
                                            dstewart@gustafsongluek.com
10

11                                          Daniel E. Gustafson
                                            Daniel C. Hedlund
12                                          Daniel J. Nordin
                                            Ling S. Wang
13                                          **GUSTAFSON GLUEK PLLC**
                                            Canadian Pacific Plaza
14                                          120 South Sixth Street, Suite 2600
                                            Minneapolis, MN 55402
15                                          Telephone: (612) 333-8844
                                            dgustafson@gustafsongluek.com
16                                          dhedlund@gustafsongluek.com
                                            dnordin@gustafsongluek.com
17                                          lwang@gustafsongluek.com
18

19                                          ***Counsel for Plaintiff and the Proposed Class***

20

21

22

23

24

25

26

27

28

41